IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

ROBIN L. DAY,

        **Plaintiff,**

  v.                                    Civil Action 2:18-cv-1627
                                         Judge George C. Smith
                                         Magistrate Judge Jolson

COMMISIONER OF
SOCIAL SECURITY,

        **Defendant.**

## REPORT AND RECOMMENDATION

Plaintiff, Robin L. Day, brings this action under 42 U.S.C. § 405(g) seeking review of a final decision of the Commissioner of Social Security ("Commissioner") denying her applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). For the reasons set forth below, it is **RECOMMENDED** that Plaintiff's Statement of Errors (Doc. 13) be **OVERRULED**, and that judgment be entered in favor of Defendant.

**I.    BACKGROUND**

    **A. Prior Proceedings**

Plaintiff filed her applications for DIB and SSI on May 5, 2015, alleging that she was disabled beginning June 20, 2014. (Doc. 8, Tr. 209–23). After her applications were denied initially and on reconsideration, the Administrative Law Judge (the "ALJ") held a hearing on October 17, 2017. (Tr. 44–69). On March 13, 2018, the ALJ issued a decision denying Plaintiff's application for benefits. (Tr. 10–32). The Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner. (Tr. 1–6).

This matter is now fully briefed and ripe for resolution. (*See* Docs. 13, 14).

### B. Relevant Medical Background

In his decision, the ALJ usefully summarized Plaintiff's physical and mental medical diagnoses and symptoms.

#### 1. Physical Health

##### *a. 2014 Records*

> A July 2014 EMG and nerve conduction study was normal. (Exhibit 11F, pages 13–14). A November 2014 MRI of the lumbar spine showed normal alignment of the lumbar spine. There was mild disc desiccation at L4-L5 and L5-S1. At L2-L3, there was a left foraminal disc protrusion and facet arthropathy with mild left neural foraminal narrowing. At L3-L4, there was a disc protrusion and facet arthropathy with moderate to severe right neural foraminal narrowing. The protrusion abutted the L3 nerve root. At L4-L5, there was a disc bulge and facet arthropathy with mild neural foraminal narrowing. At L5-S-1, there was a disc protrusion. (Exhibit 1F, pages 14–15).

(Tr. 21).

##### *b. 2015 Records*

> A January 2015 CT scan showed mild chronic height loss at L1. (Exhibit 2F, page 17). An October 2015 pelvis X-ray was normal. (Exhibit 13F, page 1; Exhibit 15F). October 2015 lumbar X-rays showed a mild old compression deformity at the endplate of L1 that had not significantly changed from a March 2015 CT scan. This compression deformity was thus stable. (Exhibit 13F, page 3; Exhibit 14F).

(*Id.*).

> The claimant also fractured her left clavicle and this was surgically repaired. The claimant fractured her clavicle following a rollover motor vehicle accident on January 23, 2015. She had been driving and had lost control going around a corner of a snow covered road. She also had a rib fracture. She reported chest, rib, and left shoulder pain, but no numbness. (Exhibit 1F, page 3; Exhibit 2F, pages 3–4, 6). She had a minimal displaced closed left clavicle fracture and was placed in a sling. (Exhibit 2F, page 7). She indicated she did not want anything for her pain. (Exhibit 3F, page 22).

> On February 5, 2015, she had open reduction and internal fixation (ORIF) surgery on the left clavicle. (Exhibit 4F, page 14). She was doing well and her sutures were removed without complication. X-rays were in good alignment. She was to ice and elevate the area and use a brace. (Exhibit 6F, page 11). In March 2015, she

2

reported taking pain medication at bedtime mainly for her left shoulder. (Exhibit 3F, page 12). She reported having numbness in the fingers of her left hand that had started three weeks prior with a burning sensation at her surgical site. (Exhibit 6F, page 8). In April 2015, she reported she was doing well. She reported numbness in her right arm. She was starting to do gentle range of motion exercises at home. Her incisions were well healed. (Exhibit 6F, page 5).

In May 2015, she was doing well with no concerns. Her range of motion was intact and had improved to near full. Her surgical wound was well healed. (Exhibit 6F, page 2). She reported some non-specific intermittent numbness and tingling in her hands. She reported soreness in her arm. She had not yet gone to physical therapy but was doing exercises on her own and was progressing. (Exhibit 6F, page 3).

In June 2015, she reported some left arm numbness and tingling when she put pressure or laid on it. (Exhibit l0F, page 8). In July 2015, she still reported some numbness and tingling in the lateral half of her left forearm. (Exhibit 7F, page 4).

(Tr. 22).

### c. 2016 Records

A January 2016 MRI of the lumbar spine showed a small amount of disc bulge at L2-L3 and L3-L4. At L2-L3 there was mild narrowing of the neural foramen. At L5-Sl, there was a disc protrusion without stenosis or narrowing. At L3-L4, there was a disc bulge and facet arthropathy with mild canal stenosis and mild foraminal narrowing. (Exhibit 18F, pages 9, 37, 153– 154).

(Tr. 21–22).

### d. 2017 Records

In January 2017, she still reported having some numbness and tingling in the left forearm. However, she was not having any treatment for this and only reported it to her oncologist. (Exhibit 18F, page 9). In August 2017, she again mentioned this to her oncologist. (Exhibit 24F, page 10).

(Tr. 22).

## 2. Mental Health

### a. 2014 Records

In June 2014, it was noted she had a history of depression that was improved with medication. (Exhibit 4F, pages 47–48).

(Tr. 24).

> ### b. 2015 Records
>
> On August 12, 2015, the claimant had a consultative examination with Dr. Joan Simpson. The claimant reported she could not stand to be around people. She indicated she would feel crowded and get out of situations as fast as she could. She reported that since her car accident she did not remember things like she should. She claimed to have long and short term memory issues. She reported a history of issues with supervisors and coworkers. She reported being generally anxious and withdrawn from others. She claimed to have trouble with attention and motivation. She reported she stopped taking her antidepressants on her own. She reported being fatigued and liked to be alone. She claimed to have panic attacks. She would spend time watching television, listening to music, and playing video games. She reported having a few friends with minimal contact. She reported sometimes needing reminders to take care of her grooming and hygiene. She would prepare meals, do household chores, drive, and shop for groceries. She repeated she would shop at night to avoid people. She reported having poor management of her finances due to her memory. (Exhibit 8F).
>
> On examination with Dr. Simpson, the claimant was cooperative. She was neat and clean with good grooming and hygiene. She was anxious, nervous, and tearful. Her thought process was intact. Her language skills were normal. She had no word retrieval difficulty. She was fidgety. She looked around the exam room frequently. She was alert and oriented. She could recall five digits forwards and three backwards. She could not do the serial sevens, but could do the serial threes. She could not do mental word problems other than simple addition and subtraction. Her abstract reasoning was intact. She was estimated to have low average intelligence. Her judgment and insight were intact. (Exhibit 8F).

(Tr. 26–27).

> In July 2015, she continued to report depression. (Exhibit 7F, page 4). In September 2015, she reported having a lot of anxiety and was seen crying. She claimed to have anxiety attacks every other day where she would feel anxious and not want to be around people. She reported she would get frustrated when her husband or grandchild did something at home not the way she would like it done. She was started on new medication and was offered counseling and a psychiatry referral. (Exhibit 10F, pages 4–5).
>
> In October 2015, she reported anxiety as well as depression, but reported she was doing well. (Exhibit 10F, page 2). She started to be seen by a mental health specialist. She reported feeling very down with suicidal ideations. She reported having memory problems, but was very vague and specific problems with memory mainly related to her health care because she provided other information very clearly. She reported no problems driving or getting lost. She had good registration

4

and could perform her activities of daily living  She reported she could do chores without problem.  She had no problem with names.  She reported having verbal aggression when anxious.  She reported she wore sunglasses in stores to avoid eye contact with others.  (Exhibit 16F, page 7).  She reported being unable to be around people any more.  She reported some new depression following her motor vehicle accident.  She reported being inordinately forgetful and more depressed since the accident.  The claimant claimed she would just sit around at home and often did not bother to bathe.  She indicated she was going to church.  Her provider specifically asked the claimant about her Social Security application, though the claimant denied that her visit was about that.  (Exhibit 16F, page 4).  It was noted her reported memory loss was very vague and selective.  (Exhibit 16F, page 6).

In November 2015, she reported that she had been doing a little better, but was now doing much better following an increase in her medication.  She reported having some weird dreams, but no other side effects from her medication.  (Exhibit 16F, page 1).  She reported she did all the housework and cooking.  She was noted to be very active at home.  Her treatment provider noted that though the claimant seemed genuinely depressed, it did not appear to impact her functioning to any great degree.  (Exhibit 22F, page 55).  In December 2015, she reported having mostly bad days.  (Exhibit 22F, page 51).

(Tr. 24).

### 3. *2016 Records*

In January 2016, she admitted she did the cooking and the cleaning around the home. (Exhibit 22F, page 46).  She reported her depression and anxiety were better.  (Exhibit 17F, page 8).  She reported being afraid to drive in the snow since her accident.  (Exhibit 22F, page 46).  In February 2016, she was able to drive herself to her appointment despite the snow.  (Exhibit 22F, page 44).  In April 2016, she wanted her Xanax increased.  Her doctor told her she would have to be referred to a psychiatrist for this, but the claimant declined and decided to stay on her current dose.  (Exhibit 17F, page 6).  She once reported she had taken six Xanax in a single day.  (Exhibit 22F, page 35).  She had recently lost a family member and had some grief over this.  (Exhibit 22F, page 39).  In May 2016, she was stressed and had twelve people in her home.  The claimant reported having some good days.  (Exhibit 22F, page 33).  In June 2016, several people moved out of her home.  (Exhibit 22F, page 31).

In August 2016, she was taking Xanax as needed for her anxiety.  She reported she was doing well.  (Exhibit 17F, page 3).  She was babysitting her grandkids daily.  She reported being irritable and did not want to talk to anyone or do anything.  (Exhibit 22F, page 28).  She was noted to have a dramatic and histrionic style and it appeared she needed to talk to a supportive listener.  She reported having some discomfort being around people.  (Exhibit 22F, page 26).  In September 2016, several family members had moved into her home.  She reported being increasingly

5

depressed and would stay on the couch all day. She indicated she would spend the entire day playing computer and video games. She enjoyed her grandsons. (Exhibit 22F, page 20). In December 2016, she reported the holiday were [sic] doing okay and her therapy sessions were helping. (Exhibit 22F, page 15). It was difficult to elicit anything positive from the claimant. (Exhibit 22F, page 18).

(Tr. 24–25).

### 4. 2017 Records

In January 2017, she reported her husband made very good money so there was no big press for her to get a job. She indicated she would spend a lot of time sitting around doing nothing but play computer games. She reported things were going well at home. She was noted to be smiling and seemed happy. (Exhibit 22F, page 13).

In February and June 2017, she denied having any difficulty concentrating or memory loss. (Exhibit 20F, pages 4, 7). In February 2017, she was happier and brighter, though she did report having an argument with her son. (Exhibit 22F, page 9). In April 2017, she seemed particularly upset and angry and described a panic attack. She had attended an event with family members and friends, but she got a feeling that she had to leave. She was able to calm down with her medication. (Exhibit 22F, page 7). In May 2017, she told her mental health provider she was forgetting a lot of stuff. She reported having a bad temper more often now. She indicated she was sleeping a lot. (Exhibit 22F, page 5).

In June 2017, her anxiety and depression were doing okay on medication. (Exhibit 21F, page 1). However, later that month she told her psychologist her anxiety was getting worse and she was no longer comfortable around people, as she thought they were laughing at her. She gave no specifics about when this began and she indicated she did not feel like leaving the house. The psychologist noted that the claimant's current functioning apart from the newly reported hesitancy to leave the home would not indicate a disabling level of depression or anxiety. (Exhibit 22F, page 3). She also told her psychologist she had memory problems since her automobile accident, though this was not evident on exam. The claimant had been spending her time in the hospital caring for her mother. She also reported she spent a lot of time caring for her five and nine year old grandsons. She was also going to travel to Tennessee soon to visit her aunt. The claimant reported she was not a people person and did not want to be around them often. She indicated she would spend a lot of time playing computer games. She would cook, mow the grass, and use the weed eater. (Exhibit 22F, page 1). In July 2017, her treatment provider noted that although the claimant reported new symptoms of not wanting to be in crowds, the treatment provider did not see anything in the psychological makeup and current functioning which would suggest disability on a psychological basis. (Exhibit 23F, page 1).

6

(Tr. 25).

### C. The ALJ's Decision

The ALJ found that Plaintiff meets the insured status through December 31, 2019, and had not engaged in substantial gainful employment since June 20, 2014, the alleged onset date. (Tr. 12). The ALJ determined that Plaintiff suffered from the following severe impairments: anxiety disorder not otherwise specified, depressive disorder not otherwise specified, cognitive disorder, lumbar degenerative disc disease with stenosis, status-post open reduction internal fixation (ORIF) of a mid left clavicle fracture, and obesity. (Tr. 12–13.). The ALJ, however, found that none of Plaintiff's impairments, either singly or in combination, met or medically equaled a listed impairment. (Tr. 13).

As to Plaintiff's residual functional capacity ("RFC"), the ALJ opined:

> [T]he claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except no climbing of ladders, ropes or scaffolds; frequently climb ramps and stairs, stoop, and reach overhead with the left upper extremity; occasionally work in an environment where the temperature was less than thirty degrees Fahrenheit; goal based, production work measured by end result, not pace work; work limited to simple, routine, and repetitive tasks, allowed off task five percent of the day; work in low stress job defined as occasional changes in the work setting; occasional interaction with the public, coworkers, and supervisors.

(Tr. 16).

The ALJ noted that Plaintiff claimed she "was disabled due to deteriorating and bulging discs in her back, pinched nerves in her right leg, after effects of prior chemotherapy, a broken collarbone with a metal plate, high blood pressure, allergies, and acid reflux." (Tr. 17). The ALJ then considered Plaintiff's specific symptoms:

> The claimant reported a variety of symptoms. She reported being depressed and did not like to be around people. She reported she did not like going places. She reported having bad mood swings. She reported she quit taking mental health medication and was for a while not having any mental health treatment. She

7

claimed to have long and short-term memory issues since her history of chemotherapy. She reported getting stressed easily. (Exhibit 5E). She claimed to have difficulty concentrating and staying on task. (Exhibit 7E). She reported she would lose her temper quickly and got aggravated easily. She indicated she had night sweats and would toss and turn. (Exhibit 14E). She reported it was hard for her to sit or stand for long. (Exhibit 9E). She claimed she would have to alternate between sitting and standing throughout the day. (Exhibit 14E). She reported having pain in her back. She claimed to have fallen many times as her right leg would go out. She indicated this had not happened in a long time since she got injections. She reported her left leg was now numb. She testified her pain was worse in temperatures below thirty degrees. After fracturing her arm, she reported her left arm would go numb. She reported having no strength in her left arm. (Hearing testimony). She indicated she had difficulty lifting, squatting, bending, walking, sitting, kneeling, climbing stairs, with memory, following instructions, completing tasks, concentrating, and getting along with others. She reported she could walk for fifteen minutes at a time. She reported she did not get along with authority figures, because she would get angry. She indicated she did not handle stress well. She claimed changes in routine triggered her anxiety. (Exhibit 14E).

(Tr. 18).

Next, the ALJ examined Plaintiff's daily activities:

She reported she would not stay at family functions for long. She could shop in grocery stores. She could leave the house on her own. She would go to church regularly. She could remember to take [sic] pay her bills. Her husband would remind her to take her medication. (Exhibit 5E). Later, she reported needing no reminders to take her medication or manage her personal care. (Exhibit 14E). She claimed to lack the motivation to take care of her personal hygiene. (Exhibit 7E). She claimed to showered [sic] only once a week. She reported it was hard to put shirts on overhead and she had to have help putting on shoes and socks. She reported her daughter would help her shave and do her hair. She indicated her daughter did the cooking and that she never cooked. (Exhibit 14E). However, she later testified that she would cook dinner. (Hearing testimony). She claimed her daughter did all the housework and her husband did all the yard work. (Exhibit 14E). She later testified that she and her daughter-in-law did the household chores. She testified she could sweep one room before having to sit. She could wash the dishes and do laundry. She would lie out clothes for her grandchildren. (Hearing testimony). She reported she would go outside as little as possible. She could drive and go out alone. (Exhibit 14E). She testified she would get angry when she drives. (Hearing testimony). She could manage her own money. She would talk with family members. She reported being afraid to go to public places and would have anxiety attacks. (Exhibit 14E). She claimed she would lie down every day. She would read the paper and play games on the computer. She could feed her dogs. (Hearing testimony).

8

(Tr. 18–19). After reviewing her medical records and daily activities, the ALJ found that Plaintiff's "statements about the intensity, persistence, and limiting effects" of her symptoms were "inconsistent" with the objective evidence. (Tr. 19).

The ALJ then turned to the opinion evidence. First, he considered the opinions of state agency psychological consultants Dr. Karla Voyten and Dr. Vicki Warren, who opined that Plaintiff had a number of work-related limitations due to her mental health. (Tr. 27). The ALJ assigned these opinions "partial weight" because Drs. Voyten and Warren did not have an opportunity to review Plaintiff's more recent mental health treatment records. (*Id.*). Second, the ALJ considered the opinions of state agency consultants Dr. Lynn Torello and Dr. Michael Delphia, who opined that Plaintiff could do light work with frequent stooping and climbing ramps and stairs, but never climbing ladders, ropes, or scaffolds. (*Id.*). The ALJ also assigned their opinions "partial weight" because they too did not have a chance to review Plaintiff's more recent mental health treatment records. (*Id.*).

Third, the ALJ considered the opinion of consultative examiner Dr. Joan Simpson, who opined that Plaintiff did not appear to maintain capacity in the areas of understanding, remembering, carrying out instructions, or maintaining attention, concentration, persistence and pace. (*Id.*). The ALJ found Dr. Simpson's opinion consistent with the record and afforded it "great weight." (*Id.*).

Finally, the ALJ considered the opinion of psychologist Catherine Flynn, who completed a form on which she opined that Plaintiff had a number of limitations due to her mental health. (Tr. 27). The ALJ assigned Ms. Flynn's opinion "little weight," explaining that "the form itself is skewed" and that its findings were both internally and externally inconsistent. (Tr. 29).

9

Based on his review of Plaintiff's testimony, medical records, and opinion evidence, the ALJ concluded that the RFC "is supported by the conservative treatment history, the longitudinal medical record, the claimant [sic] conditions being well controlled by medication and treatment, the claimant's statements, the opinion of the consultative examiner, and the claimant's presentation on examination." (*Id.*). In addition, the ALJ found that many of Plaintiff's allegations were "not entirely consistent with the evidence," and that "imaging did not support the significant degree of impairment alleged." (*Id.*). For example, he noted that her back issues "improved significantly following injections" and that "she did not have significant continuing treatment for her clavicle fracture following surgical repair." (Tr. 29–30). He further found that her "mental health providers also did not see any signs that would suggest disability on a psychological basis." (Tr. 30).

Relatedly, the ALJ also found that the evidence showed Plaintiff's "significant functioning," which he found to be "inconsistent with her allegations of disability." (*Id.*). He noted, for example, that "[p]rior to her January 2015 motor vehicle accident, she reported being able to run a short distance, do heavy housework such as scrub the floor, move heavy furniture, and moderately play sports." (*Id.*). And, the ALJ noted that, following her clavicle fracture, "she still had significant functioning," demonstrated by the fact that she usually hosted Thanksgiving at her home for her large family, mowed the lawn, cooked for her family, and reported once crawling under her trailer to dig up the sewer line in order to fix the air conditioner. (*Id.*). The ALJ also considered the fact that Plaintiff spent a significant amount of time caring for her five-year-old and nine-year-old grandsons, as well as the fact that she was able to travel. (*Id.*).

In conclusion, the ALJ opined:

The claimant's degenerative disc disease of the lumbar spine with stenosis, obesity, and her status-post ORIF of a mid-left clavicle fracture would be expected to limit her to light work with postural, manipulative, and environmental limitations. Her anxiety, depressive, and cognitive disorder would also result in mental limitations.

> Thus, all evidence has been considered in assessing the claimant's residual functional capacity.

(*Id.*).

## II. STANDARD OF REVIEW

The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 F. App'x 315, 320 (6th Cir. 2015); *see* 42 U.S.C. § 405(g). "[S]ubstantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)). The Commissioner's findings of fact must also be based upon the record as a whole. *Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985). To this end, the Court must "take into account whatever in the record fairly detracts from [the] weight" of the Commissioner's decision. *Rhodes v. Comm'r of Soc. Sec.*, No. 2:13-cv-1147, 2015 WL 4881574, at *2 (S.D. Ohio Aug. 17, 2015).

## III. DISCUSSION

In her sole objection, Plaintiff asserts she has additional severe impairments beyond those accounted for in the ALJ's decision. Specifically, she claims that the ALJ "erred in failing to consider the severity" of her left shoulder impairment and her right breast cancer. (Doc. 13 at 14). By failing to consider "whether these impairments were or were not severe," Plaintiff contends that the ALJ failed to consider their impact on her RFC. (*Id.* at 15).

As an initial matter, the Court is not convinced that Plaintiff's severe impairments of cognitive disorder and surgery for her mid-left clavicle fracture do not encompass the more specific conditions of Plaintiff's memory loss from her breast cancer treatment and shoulder pain related

to her clavicle fracture. *See, e.g.*, *Salmen v. Berryhill*, No. 3:16-CV-218-CCS, 2017 WL 4293150, at *4 (E.D. Tenn. Sept. 27, 2017) (finding that plaintiff's severe impairment of "neck disorder" likely encompassed the more specific diagnoses of cervical spondylosis, cervical degenerative disc diseases, cervical stenosis, and cervical radiculitis). As for her breast cancer treatment, Plaintiff asserts that chemotherapy and radiation resulted in "memory problems," which she identifies as one of the "primary" reasons she cannot work. (Doc. 13 at 15). But Plaintiff does not explain how her memory problems are not accommodated by her broader condition of "cognitive disorder," which the ALJ found to be severe. Similarly, Plaintiff experienced left shoulder pain following her January 2015 car accident in which she fractured her clavicle and required open reduction and internal fixation surgery. (Tr. 22). Again, Plaintiff does not articulate how her left shoulder pain is not accounted for by the ALJ's finding that her left clavicle fracture is a severe condition. *See, e.g.*, *Waters v. Comm'r of Soc. Sec.*, No. CIV.A. 10-14927, 2012 WL 511998, at *6 (E.D. Mich. Jan. 5, 2012) ("[W]hile the ALJ did not include the term 'lumbar back condition' in her Step Two findings, she found the 'history of gunshot wound,' thereby acknowledging Plaintiff's claim that alleged bullet fragments (allegedly causing back pain) created a work-related limitation."), *adopted by*, No. 10-14927, 2012 WL 512021, at *1 (E.D. Mich. Feb. 16, 2012); *Williams v. Comm'r of Soc. Sec.*, No. CIV.A. 10-14149, 2011 WL 6217418, at *7 (E.D. Mich. Nov. 4, 2011) ("Finally, the ALJ's recognition of a 'discogenic degenerative disorder of the back' as a severe impairment at step two seems to encompass Plaintiff's cervical facet syndrome."), *adopted by*, No. 10-14149, 2011 WL 6217074 (E.D. Mich. Dec. 14, 2011).

And, to the extent that the effects of Plaintiff's breast cancer treatment and shoulder condition are "separate and distinct impairments" from her cognitive disorder and clavicle fracture, *Salmen*, 2017 WL 4293150, at *4, the ALJ did not err in his assessment of these conditions. The

"operative question" is not whether the ALJ classified Plaintiff's impairments as "severe" or "not severe," but rather, "whether the ALJ considered the actual impact" of these conditions on her functional capacity to work. *Tinsley v. Astrue*, No. CIV. A. 1:08CV31-J, 2008 WL 4724494, at *1–2 (W.D. Ky. Oct. 23, 2008). An ALJ does not err simply by failing to classify a condition as severe, "so long as the effect of that condition is considered in determining whether the claimant retained sufficient functional capacity to allow him to perform substantial gainful activity." *Williams v. Astrue*, No. CIV.A. 3:07CV26-J, 2008 WL 4386771, at *1 (W.D. Ky. Sept. 23, 2008) (quotation marks and citation omitted); *see also Cox v. Colvin*, No. 3:14CV00023, 2015 WL 541794, at *6 (S.D. Ohio Feb. 10, 2015), *report and recommendation adopted*, No. 3:14CV00023, 2015 WL 892343 (S.D. Ohio Mar. 2, 2015) (remanding where the ALJ "did not simply miscategorize the impairment," but instead "failed entirely to provide any indication that he actually considered this impairment at any step in the sequential analysis")).

As explained below, the ALJ properly considered the effects of Plaintiff's breast cancer treatment and shoulder pain on her ability to work.

### A. Breast Cancer Treatment

Plaintiff, in her Statement of Errors, explains that, after being diagnosed with breast cancer and receiving chemotherapy and radiation treatment, she "continued to follow up with her oncology team in relation to her breast cancer diagnosis[.]" (Doc. 13 at 14 (citing Tr. 444, 465, 477, 489, 495, 547, 677, 693, 700, 708, 716, 726, 958)). For support, she relies on treatment records documenting that she "reported" her "ongoing symptoms" from the treatment as palpitations, hot flashes, weight gain, shortness of breath, and memory difficulties. (*Id*. at 15). Of those symptoms, she focuses mainly on her memory issues, citing her memory "as one of the 2 primary reasons that she could not work." (*Id*.).

Plaintiff asserts that the ALJ "undertook absolutely no analysis" regarding the severity of her symptoms and "fail[ed] to thereafter consider their impact" on her RFC. (*Id*. at 15). Plaintiff's argument fails for several reasons.

To start, the ALJ explicitly considered the effects of Plaintiff's chemotherapy treatment. He first noted Plaintiff's "history of breast cancer," focusing on Plaintiff's "memory loss issues." (Tr. 23). The ALJ also thoroughly reviewed Plaintiff's treatment records and noted that "she did not routinely report any memory loss issues from her cancer medications to her oncologist." (*Id*.). He went on to note that, "[o]nly in an August 2017 visit with her oncologist did she mention any difficulty remembering things, which was years after she made the claim to the Social Security Administration that her memory issues had been caused by chemotherapy." (*Id*.). Indeed, he found that "[t]he only other" time she mentioned these issues was "once to her mental health provider." (*Id*.). Otherwise, Plaintiff "reported having memory loss" stemming from her car accident. (*Id*.).

The ALJ also gave "great weight" to the opinion of Dr. Simpson, who considered Plaintiff's reports of memory problems. *See, e.g.*, *Cover v. Berryhill*, No. 3:16-CV-646-CCS, 2018 WL 283246, at *4 (E.D. Tenn. Jan. 3, 2018) (finding that ALJ sufficiently considered plaintiff's PTSD where ALJ gave great weight to the opinions of state agency consultants who considered plaintiff's diagnosis of PTSD and assessed moderate mental health limitations); *Salmen*, 2017 WL 4293150, at *4 (finding that, in assigning great weight to the opinions of consultative examiner who considered plaintiff's cervical degenerative disc disease and neck pain, the ALJ "fulfilled her obligation that all of the Plaintiff's impairments be considered").

Further, the ALJ, throughout his opinion, considered numerous treatment records documenting Plaintiff's complaints of memory loss. (*See, e.g.*, Tr. 18 (noting that Plaintiff

"claimed to have long and short-term memory issues since her history of chemotherapy"); *id*. (noting that Plaintiff's husband would have to remind her to take her medication but later reported needing no reminders to take her medication or manage personal care); Tr. 24 (noting that Plaintiff "reported having memory problems, but was very vague and specific problems with memory mainly related to her health care because she provided other information very clearly"); *id*. (noting that Plaintiff reported no problems driving or getting lost); *id*. (noting that Plaintiff's "reported memory loss was very vague and selective"); *id*. (noting that, in February and June 2017, Plaintiff denied having memory loss or any difficulty); *id*. (noting that, in May 2017, Plaintiff told her mental health provider that she was forgetful); *id*. (noting that Plaintiff told her psychologist she had memory problems since her automobile accident but that "this was not evident on exam"); *Id*. (noting that, on exam, Plaintiff was alert and oriented); Tr. 26 (noting that, on exam, Plaintiff's short-term memory was "sometimes intact," that she selectively reported memory loss, and that her "fund of knowledge" was normal); *id*. (noting that, during her consultative exam with Dr. Simpson, Plaintiff reported that since her car accident she did not remember things like she should and claimed to have short and long term memory issues, and also reported sometimes needing reminders to take care of her grooming and hygiene and having poor management of her finances due to her memory); *id*. (noting, that on exam with Dr. Simpson, Plaintiff had normal language skills, no word retrieval difficulty, was alert and oriented, could recall five digits forwards and three backwards, could not do the serial sevens, but could do the serial threes, and could not do mental word problems other than simple addition and subtraction); *id*. (noting that Dr. Simpson opined that Plaintiff did not appear to have capacity in the area of understanding, remembering, carrying out instructions, and maintaining attention and concentration, persistence, and pace, but did have the capacity to respond appropriately to supervision, coworkers, and work pressures)).

In sum, a review of the ALJ's decision makes clear that he considered the effects of Plaintiff's breast cancer treatment and thoroughly discussed treatment records pertaining to memory and cognitive issues. *See, e.g.*, *Salyer v. Comm'r of Soc. Sec.*, No. 2:17-CV-89, 2018 WL 817877, at *3–5 (S.D. Ohio Feb. 12, 2018), *report and recommendation adopted*, No. 2:17-CV-89, 2018 WL 1151810 (S.D. Ohio Mar. 5, 2018) (rejecting plaintiff's argument that the ALJ erred by failing to classify her depression as severe where the ALJ "specifically" considered her depression and "included a discussion of her treatment history and medications"). So Plaintiff's complaint that the ALJ "undertook absolutely no analysis" as to the severity of her breast cancer treatment falls short.

### B. Shoulder Impairment

Turning to her shoulder impairment, Plaintiff relies on a handful of medical records and hearing testimony to assert that the ALJ failed to sufficiently consider her shoulder condition when formulating her RFC. (Doc. 13 at 14–15 (citing Tr. 524 (documenting left shoulder pain); Tr. 541 (January 2015 x-ray of her left shoulder indicating moderate degenerative change of the AC joint); Tr. 442 (March 2015 x-ray indicating advanced degenerative change of her left shoulder AC joint); Tr. 52 (hearing testimony that she has "no strength" in her left shoulder))).

As explained above, an ALJ does not commit reversible error simply by failing to classify certain impairments as severe or not severe. *See, e.g., Salmen*, 2017 WL 4293150, at *4 (noting that the ALJ, despite not characterizing certain impairments as severe or not severe, considered imaging studies, assigned great weight to opinions documenting the impairments, and accordingly, satisfied her obligation in considering all of plaintiff's impairments). The critical question is whether the ALJ "considered the actual impact" of each impairment on the plaintiff's ability to work. *See Tinsley*, 2008 WL 4724494, at *1–2. Here, the ALJ more than satisfied that standard.

To start, the ALJ thoroughly reviewed and relied on treatment records pertaining to Plaintiff's shoulder pain. (*See e.g.*, Tr. 18 (noting that Plaintiff testified that, after her accident, her arm would go numb and she had no strength in her left arm); Tr. 19 (discussing August 2014 records documenting Plaintiff's reports of pain in her upper left shoulder); *id.* (discussing March 2015 records, which showed reports of Plaintiff taking Percocet at bedtime, mainly due to her shoulder); Tr. 20 (noting that Plaintiff reported, in April 2015 that she had fallen on her left side); Tr. 21 (noting that exam records showed that Plaintiff had full range of motion in all extremities except her left shoulder); Tr. 22 (noting that Plaintiff fractured her left clavicle following her January 2015 rollover car accident, and subsequently reported chest, rib, and left shoulder pain); *id.* (noting that Plaintiff had open reduction and internal fixation surgery in February 2015 on her left clavicle and that, in April of that year she was doing well and starting to do some gentle range of motion exercises at home); *id.* (noting June 2015 records documenting left arm numbness and tingling when she put pressure or laid on it); *id.* (noting the same regarding July 2015 records); *id.* (noting that, in January 2016, Plaintiff reported falling and landing on her left shoulder and reported having pain in that shoulder); *id.* (noting that on examination she had reduced range of motion in her left shoulder but that later, her shoulder had near full range of motion)).

The ALJ also considered Plaintiff's hearing testimony regarding her shoulder issues. (Tr. 18 ("After fracturing her arm, she reported her left arm would go numb. She reported having no strength in her left arm.")). He also relied on medical records documenting Plaintiff's range of motion in her left shoulder:

> On examination, she had reduced range of motion in her left shoulder. (Exhibit 2F, pages 7, 11; Exhibit 6F, page 17). Later, her left shoulder had near full range of motion. (Exhibit 6F, page 2). Her left clavicle was tender following the accident. (Exhibit 2F, page 8; Exhibit 3F, page 21; Exhibit 13F, page 6).

(Tr. 22).

17

Based on the above, Plaintiff's argument that the ALJ "undertook absolutely no analysis" regarding the severity of her shoulder impairment is not convincing. (Doc. 13 at 15). Nor is her argument that the ALJ "faile[ed] to consider" the impact of her shoulder condition on her functional capacity to work. (*Id*.). To the contrary, throughout his review of the medical records and opinion evidence, the ALJ considered the lasting effects of Plaintiff's car accident, including her fractured collarbone, left shoulder pain, and subsequent surgery. (Tr. 22). He also considered her January 2016 fall on her left shoulder. (*Id*.). It is clear, therefore, that the ALJ fulfilled his obligation to meaningfully consider the "actual impact" of Plaintiff's shoulder pain. *See Tinsley*, 2008 WL 4724494, at *1–2. In reviewing the treatment records, opinion evidence, Plaintiff's daily activities, and the fact that she did not have significant continuing treatment for her clavicle fracture following surgery, (Tr. 30), the ALJ reasonably concluded that her left shoulder and left clavicle pain were accommodated by limiting Plaintiff to light work with no climbing of ladders, ropes, or scaffolds and no reaching overhead with the left upper extremity. As such, Plaintiff has shown no reversible error.

## IV. CONCLUSION

Based on the foregoing, it is **RECOMMENDED** that Plaintiff's Statement of Errors (Doc. 13) be **OVERRULED**, and that judgment be entered in favor of Defendant.

## V. PROCEDURE ON OBJECTIONS

If any party objects to this Report and Recommendation, that party may, within fourteen (14) days of the date of this Report, file and serve on all parties written objections to those specific proposed finding or recommendations to which objection is made, together with supporting authority for the objection(s). A District Judge of this Court shall make a de novo determination of those portions of the Report or specific proposed findings or recommendations to which

objection is made. Upon proper objection, a District Judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the Magistrate Judge with instructions. 28 U.S.C. § 636(b)(1).

The parties are specifically advised that failure to object to the Report and Recommendation will result in a waiver of the right to have the district judge review the Report and Recommendation de novo, and also operates as a waiver of the right to appeal the decision of the District Court adopting the Report and Recommendation. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

IT IS SO ORDERED.


Date:   September 12, 2019                    /s/ Kimberly A. Jolson
                                              KIMBERLY A. JOLSON
                                              UNITED STATES MAGISTRATE JUDGE